UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x

LU NING,                                                          :
                                                                  :
                                 Plaintiff,                       :
                                                                  :
                 v.                                               :          3:23-CV-00395 (SFR)
                                                                  :
MICHAEL ZYDA, 411 PRODUCTIONS DTLA,                               :
LLC,                                                              :
                                                                  :
                                 Defendants.                      x
------------------------------------------------------------------

**MEMORANDUM AND ORDER**

Defendants Michael Zyda and 411 Productions DTLA, LLC (DTLA) bring this motion

for summary judgment against Plaintiff Lu Ning. Defendants also seek summary judgment on

their own counterclaim.

For the reasons that follow, summary judgment against Ning on her federal claims is

granted. I reserve decision on Ning's state law claims and Defendants' counterclaim.

I.       **BACKGROUND**

         A.       **Factual Background**

This case arises from a relationship between Lu Ning and Michael Zyda.[1] As relevant

to this case, that relationship began when Ning informed Zyda that she was a student at the

University of Southern California ("USC"), where Zyda (founder and CEO of DTLA) taught

computer science. Pl.'s 56(a)2 St. ¶¶ 1, 13-14; Zyda Aff. ¶ 17, ECF No. 30-3. In 2016 and

---

[1] The factual background is drawn primarily from facts in Ning's Rule 56(a)2 Statement of Facts,
ECF No. 35, Defendants' 56(a)1 Statement of Facts, ECF No. 30-2, and various exhibits attached
to these Statements. Citations to the Rule 56(a)1 and 56(a)2 Statements are by paragraph number.
With respect to other documents, page citations are to the page number generated by the ECF
system.

2017, Ning regularly communicated with and visited Zyda at his apartment in California. Pl.'s 56(a)2 St. ¶ 19.

In 2017, Defendants assert that Zyda allowed Ning to "join a student team in his course on mobile games." *Id.* ¶ 14. Ning began founding a company, iStarVR, in 2016, which Zyda alleges was "part of her work" in one of Zyda's computer science courses. *Id.* ¶ 15. Ning contests these categorizations, alleging that she "was invited to participate in Defendants' projects as part of her employment with DTLA," which she further asserts was formalized with a "deal memo" in 2016 outlining a "$5000 a week" salary, in exchange for which she alleges she performed services including "work on iStarVR, advisor services for Muoee, and consultation for DTLA's other clients and projects." *Id.* ¶¶ 14, 24.

At some point in approximately December 2018, Ning moved into Zyda's apartment, where she lived from 2018 to 2020. *Id.* ¶¶ 20-21. Zyda did not charge rent and paid for some or all of Ning's living expenses.[2] *Id.* ¶¶ 21-22. Defendants allege that Ning was not employed by DTLA while Ning and Zyda lived together. *Id.* ¶ 24. Ning responds that she worked on several "clients and projects" for DTLA during the period she lived with Zyda. *Id.* ¶¶ 2, 24. Zyda asserts that during this period of living together, Ning and Zyda's "roommate relationship was tumultuous and involved significant conflict." *Id.* ¶ 23. Ning counters that Zyda "trapped" her, and "coerced" her "into living with Zyda as part of an exploitative employment arrangement where she was expected to perform housework, cooking, and other personal

---

[2] Ning denies this assertion "in part." She states that "Zyda paid for some expenses" but contests the characterization of those acts as "generosity" and states that she was compelled to provide multiple services and sometimes asked to "buy food using [her] money." Pl.'s 56(a)2 St. ¶ 22. Nonetheless, Ning does not contest that Zyda paid for at least some of her living expenses.

services for Zyda, in addition to her professional responsibilities as part of her employment with DTLA." *Id.* ¶¶ 20-21. She adds that Zyda manipulated her into sleeping on the floor on an air mattress. *Id.* ¶ 21. Although the timing is not exactly clear, Ning alleges that during this period, Zyda commented on her appearance, suggested they have children together, made inappropriate comments to her, engaged in unwelcome physical contact with her including hugging her, asked her for massages (which she refused to give), and took off his shirt while around her. *Id.* ¶¶ 59-60.

On February 22, 2020, Zyda asked Ning to move out. *Id.* ¶ 25. Defendants assert that this request was due to interpersonal conflict between the two. *Id.* Ning counters that Zyda asked her to move out because she "refused his sexual advances and requests for massages." *Id.* On April 28, 2020, Ning moved to New Haven, Connecticut and charged the moving costs to Zyda's credit card. *Id.* ¶ 26.

Beginning in May 2020, Zyda agreed to pay Ning $2,000 per month to assist in translation work for a DTLA subsidiary. *Id.* ¶¶ 27-28. Ning argues that this arrangement did not represent a new employment agreement but a modification of an existing employment agreement, and that the $2,000 per month was not solely for translation work but also for housing accommodation as part of Ning's continued employment at DTLA. *Id.* ¶¶ 27-28. Defendants allege that Ning never performed the translation work, but Zyda kept her on retainer "to ensure [she] was not without any financial support in New Haven"; Ning argues that she performed the work requested by Zyda and continued her other projects as well. *Id.* ¶¶ 27-29, 32. Zyda also provided payment for other expenses, including medical bills. *Id.* ¶

3

33.[3] Defendants allege that Ning was an independent contractor, not a full-time employee, a categorization that Ning contests. *Id.* ¶¶ 11, 31-33.

In March 2022, Zyda informed Ning that he "would no longer be funding" her $2,000 per month invoices "because he had learned that her work visa had expired, and she was no longer eligible to work" in the United States. *Id.* ¶ 34. Ning categorizes this decision as retaliation "for refusing [Zyda's] sexual advances and asserting her rights." *Id.*

During the period from February 2020 to March 2022, Ning alleges that Zyda made hostile remarks based on her national origin and race. In particular, Ning asserts Zyda said she should "go back to China" and had brought COVID-19 to the United States, threatened to send her back to China, and made inappropriate comments about a potential breast cancer diagnosis. *Id.* ¶¶ 59-60.[4]

### B.    Procedural History

Ning filed the Complaint in this action on March 30, 2023, ECF No. 1, and an Amended Complaint on November 7, 2023, ECF No. 17. Defendants filed an Answer and a Counterclaim on November 28, 2023. ECF No. 20. Ning filed a Motion to Dismiss the Counterclaim on December 19, 2023. ECF No. 21. On July 12, 2024, the Court[5] denied the motion to dismiss the counterclaim. ECF No. 27.

---

[3] Ning responds that she was misclassified and should have been a full-time employee eligible for health insurance through DTLA. Pl.'s 56(a)2 St. ¶ 33.

[4] Ning also asserts that Zyda "denied housing accommodation lease renewal" in connection with a New Haven apartment, apparently by "refus[ing] to provide the necessary documentation." Pl.'s 56(a)2 St. ¶ 59; Pl.'s Mem. 10, ECF No. 34.

[5] This case was initially assigned to the Honorable Victor A. Bolden. It was transferred to me on January 6, 2025.

On January 30, 2025, Defendants filed their Motion for Summary Judgment, ECF No. 30, and supporting memorandum, ECF No. 30-1 ("Defs.' Mem."). Ning filed her opposition memorandum on March 6, 2025. ECF No. 34 ("Pl.'s Mem."). Defendants filed their reply on March 17, 2025. ECF No. 37 (Defs.' Reply").

## II.    LEGAL STANDARD

The Court will grant a motion for summary judgment if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The nonmoving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party

opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*

When deciding a motion for summary judgment, the Court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [her] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the nonmoving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.    <u>DISCUSSION</u>

Ning brings four counts against Defendants, who respond with one counterclaim. In Count One, Ning alleges that Defendants discriminated against her in violation of the Connecticut Fair Employment Practices Act. In Count Two, she alleges sex, gender, race, national origin, and sexual harassment discrimination in violation of Title VII. In Count Three, Ning alleges discrimination and failure to accommodate in violation of the Americans with Disabilities Act ("ADA"). In Count Four, Ning alleges housing discrimination in violation of the California Fair Employment and Housing Act. Zyda brings one counterclaim for defamation *per se*.

For the reasons explained below, I grant summary judgment to Defendants on Counts Two and Three. I take under advisement the motion for summary judgment with respect to Ning's state law claims and Defendants' counterclaim so that I can obtain the parties' positions with respect to my jurisdiction over those claims.

### A.    Count Two and Three: Defendants' Status as a Qualifying Employer

Defendants argue that neither DTLA nor Zyda qualify as employers under Title VII or the ADA, because both statutes apply only to employers who employ a minimum number of employees for a specified period of time. Defs.' Mem. 14-15, 18. Ning responds that there is a genuine dispute of material fact as to the number of employees working for Defendants during the relevant period. Pl.'s Mem. 22-23. Defendants reply that Ning's assertions are insufficient to defeat a motion for summary judgment. Defs.' Reply 6-7.

### 1.    Definitions of "Employer" and "Employee" Under Title VII and ADA

The employment discrimination provisions of Title VII and the ADA apply only to "employers," who are defined in both statutes, with some exceptions, as an individual or entity "who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b); 42 U.S.C. § 12111(5); *see also Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 205 (1997) (stating that Title VII only applies if, at the time of the alleged violation, the employer meets "the statutory definition of employer, to wit: a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.") (internal quotations marks omitted); *Pavel v. Plymouth Mgmt. Grp., Inc.*, 198 F. App'x 38, 40-41 (2d Cir. 2006) (summary order)  ("To be subject to the

7

terms of the ADA, the defendant must be an employer, which, under the statute, is defined as a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.") (internal quotation marks omitted).

"The definition of the term 'employee' provided in Title VII is circular: the Act states only that an 'employee' is an 'individual employed by an employer.'" *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (quoting 42 U.S.C. § 2000e(f)). "However, it is well established that when Congress uses the term 'employee' without defining it with precision, courts should presume that Congress had in mind 'the conventional master-servant relationship as understood by the common-law agency doctrine.'" *Id*. (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992).

As an initial matter, before assessing whether a hired party is an employee under the general common law of agency, the court must determine whether an individual "was hired by [the employer] for any purpose." *Id*.  To prove that she was hired, an individual

> must establish that she received remuneration in some form for her work. This remuneration need not be a salary but must consist of substantial benefits not merely incidental to the activity performed. Once plaintiff furnishes proof that her putative employer remunerated her for services she performed, we look to the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 . . . (1989) to determine whether an employment relationship exists.

*U.S. v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004) (internal quotation marks and citations omitted); *see also O'Connor*, 126 F.3d at 116 (stating that "[t]his 'essential condition' of remuneration has been recognized in this Circuit"). The remuneration test, then, examines if and how an individual was compensated for their work, and does not consider their title.

8

Individuals, including interns and students, who are not paid a salary or other wages and who are not promised and do not receive employee benefits such as health insurance, vacation, or sick pay are generally not considered to have been "hired for any purpose." *O'Connor*, 126 F.3d at 116 (finding no remuneration where student volunteer received no salary, "health insurance, vacation, or sick pay, nor was she promised any such compensation"); *Pell v. Tr. of Columbia Univ.*, No. 97 Civ. 0193 (SS), 1998 WL 19989 at *9 (S.D.N.Y. January 21, 1998) (holding that "because plaintiff was a student at Columbia University, not an employee, there exists no employer-employee relationship" and dismissing Title VII claims on that basis); *Lee v. Yale Univ.*, 624 F. Supp. 3d 120, 126, 140-41 (D. Conn. 2022) (granting motion to dismiss employment claims for failure to allege remuneration where a "voluntary faculty member" received "access to the university's libraries, subscription-based research materials, office space, [and] the university's facilities" and was covered by university's malpractice insurance, because these benefits were "merely incidental to the administration of the" programs run by the volunteer).

### 2.    Defendants Are Not Employers Under Title VII or ADA

Ning argues that she has provided sufficient evidence to create an issue of material fact that Defendants were employers under Title VII and the ADA. Pl.'s Mem. 22-23. She points to her deposition testimony where she stated that she supervised "many students, engineers, over like 20," ECF No. 35-1, at 11-12, and her interrogatory responses, where she listed 26 individuals who worked on the iStar VR project, ECF No. 30-9, at 2-3, which Ning claims was a DTLA project, Pl.'s 56(a)(2) St. ¶16. She asserts that the "fact that these individuals may be classified by Mr. Zyda as 'interns,' 'students,' or 'unpaid workers' does not exclude them from the statutory definition of employee." Pl.'s Mem. 23. Ning also identifies in her interrogatory

9

response three DTLA employees whom she alleges were employed by DTLA when she worked there: Lu Zhang, Michael Longley, and Joel Clark. ECF No. 30-9, at 3. Other than her own statements, she provides no employment documents, communications, affidavits, testimony, or other evidence to support her assertions that any other individuals were employed by DTLA.

Defendants respond that Ning "continues to confuse and conflate Zyda's students and the work they completed during his engineering courses" for an "employment relationship with Defendants." Defs.' Reply 6. In an affidavit, he asserts that he allowed Ning to work on iStar not as an employee of DTLA, but as part of "a student team in [his] Computer Science-526 course . . . and pitch her idea for iStar VR as a class project," and that the "work that Lu Ning claims she did for DTLA is actually work that she completed as part of a student project that she did with the students in" that class. Zyda Aff. ¶¶ 17-18. Defendants also provide a spreadsheet that Zyda asserts is a copy of "DTLA's records of independent contractors that worked for DTLA on various projects from 2015 [to] 2022." Zyda Aff. ¶ 68; ECF No. 30-18, at 1-2. The document includes the year they worked for DTLA, how much they were paid, and the approximate length of their projects. ECF No. 30-18, at 1-2. The document lists twelve total individuals over the entire time period, including Lu Ning, Michael Longley, Joel Clark, and an LLC, Pringo Dingo LLC. *Id.* According to the document, the largest number of individuals paid by DTLA during any year was eight individuals—not including Zyda himself—in 2015. *Id.* The document also lists Pringo Dingo LLC as paid that year. *Id.*

The record before me thus shows two groups of potential employees: first, a group of individuals whom DTLA acknowledges it paid; and second, a group of individuals who worked on the iStar VR project through Zyda's Computer Science-526 course.

10

There is no genuine dispute of material fact that the first group was not large enough, in any calendar year during the relevant period, for Defendants to be "employers" for the purpose of Title VII and the ADA. The document provided by Defendants shows eight individuals employed in 2015, and fewer than that in each subsequent year. ECF No. 30-18, at 1-2. In her responses to interrogatories, under the heading "411 Productions DTLA former employees on LinkedIn," Ning lists one additional individual, Lu Zhang. ECF No. 30-9, at 3. Therefore, taking all inferences in favor of the non-movant, and assuming without deciding that all of these individuals (including Zhang and Zyda himself) were "employees" of DTLA during 2015, the total number of identifiable individuals employed by Defendants from this category during 2015 was 10. In every subsequent year, by this metric, the number of "employees" working for Defendants was lower.

Thus, to try to establish that Defendants were employers within the meaning of Title VII and the ADA, Ning relies on the second category of individuals, which she describes in her response to interrogatories as the "iSta[r] Engineer team." ECF No. 30-9, at 2. Notably, Ning herself categorizes this "iStar Engineer team" as distinct from "former employees" of DTLA. *Id.* at 2-3. Similarly, in her deposition, she describes these individuals as "students." ECF No. 35-1, at 11-12 ("Zyda and I and students had lunch, dinner together very often . . . We were working together. I spend those amount because we have many students, engineers, over like 20. I always -- he said I should take care of them, supervise them to complete the project on time, don't follow the academic schedule at the school."). Zyda describes Ning's work on iStar VR as "part of a student project that she did with the students" in his computer science class. Zyda Aff. ¶18.

11

As Ning correctly notes, classifying these individuals as "'interns,' 'students,' or 'unpaid workers' does not exclude them from the statutory definition of employee." Pl.'s Mem. 23. But Ning provides no evidence that any of these students received any compensation from Defendants during this period—only that she worked with them, supervised them, and sometimes bought them meals. Even taking all facts as alleged by Ning in the light most favorable to her, and assuming *arguendo* that the iStar project was a "DTLA project," Ning's allegations establish only that these students worked on her project, not that they were remunerated in any form. The only evidence before me as to compensation paid by DTLA is the list of individuals, provided by the Defendants, showing individuals paid by DLTA, and the 26-member "iStar Engineer team" does not appear on that list. Neither Ning nor Zyda alleges that the students were in any way compensated.

The only evidence to the contrary is Ning's statement that she supervised these individuals and bought them lunch and dinner. But the supervision question is irrelevant to whether they were "hired for any purpose," and the provision of meals appears to be incidental to the students' coursework. *See Glaser v. Upright Citizens Brigade, LLC*, 377 F. Supp. 3d 387, 396 (S.D.N.Y. 2019) (finding that "free drinks" given to a volunteer were a type of compensation that does "not fit into any of the categories that the Second Circuit has described as indicative of financial benefit sufficient to satisfy the remuneration inquiry" and were "merely incidental" to the individual's role as a volunteer) (citing *York*, 286 F.3d at 126). On that basis, I conclude that members of the "iStar Engineer team" were not "hired for any purpose" and were not employed by Defendants for the purpose of Title VII or the ADA.

In the Second Circuit, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

12

could *reasonably* find for the plaintiff," *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original) (quoting *Anderson,* 477 U.S. at 252), and parties "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted). In this case, at the summary judgment stage, Ning is relying entirely on her own conclusory allegations and unsubstantiated speculation about the employment status of these individuals to support her claim, and that is insufficient for any reasonable jury to find in her favor. *See Devalda v. Faucher*, No. 3:21-cv-1274 (OAW), 2024 WL 4606391, at *7 (D. Conn. Oct. 29, 2024) (granting summary judgment where *pro se* plaintiff did not submit any evidence beyond his own assertions in the complaint to support his claim, and "there is simply no evidence for this court to favorably construe, let alone to rebut the evidence forwarded by Defendants").

I therefore conclude that Defendants were not employers under Title VII or the ADA at any relevant period, and grant summary judgment for the Defendants on Counts Two and Three.

### B.    Jurisdiction Over State Law Claims

Having dismissed Counts Two and Three, only state law claims and a state law counterclaim remain. Ning's Amended Complaint alleges federal question subject matter jurisdiction; it does not plead diversity jurisdiction.

Because I have dismissed Ning's federal claims, the question arises as to whether this Court retains subject matter jurisdiction over this lawsuit.[6] I note that I cannot determine, on

---

[6] *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Taylor v. Plan. & Zoning Comm'n for Westport*, No. 3:21cv1023(JBA), 2023 WL 5507842, at *6 (D. Conn. Aug. 25, 2023) ("When all federal claims have been dismissed, a federal

the basis of the pleadings, whether the Court has diversity jurisdiction over this action, because the members of DTLA, an LLC, are not identified in the Complaint. *See Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000) ("[F]or purposes of diversity jurisdiction, a limited liability company has the citizenship of its membership.").

Ning's failure to plead diversity jurisdiction in the Amended Complaint or to provide information about the members of DTLA does not prevent the Court from exercising diversity jurisdiction over the remaining claims. *See Wright v. Musanti*, 887 F.3d 577, 585-86 (2d Cir. 2018) ("When it became apparent that the original basis for federal jurisdiction—federal question jurisdiction—no longer existed, the court asked the plaintiff to explain on what basis the court could still exercise jurisdiction over the case. In response, the plaintiff demonstrated the facts necessary to establish the existence of diversity of citizenship. The court, upon reviewing the record before it, found that there was an adequate basis upon which to exercise diversity jurisdiction, in essence deeming the jurisdictional basis of the complaint constructively amended. Although the district court could have allowed [the plaintiff] to amend his complaint to allege diversity of citizenship, we see no reason to find error where the facts of citizenship were clear and the continuity of subject matter jurisdiction was never in question."); *see also Ergowerx Int'l., LLC v. Maxwell Corp. of Am.*, 18 F. Supp. 3d 430, 452-53 (S.D.N.Y. 2014) (dismissing federal claims and ordering parties to meet and confer and

---

court 'must reassess its jurisdiction over the case by considering several factors—judicial economy, convenience, fairness, and comity,'" and "'[i]f [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'") (quoting *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004)) (citations omitted).

14

then file a joint letter on the issue of whether diversity jurisdiction or supplemental jurisdiction existed)

Accordingly, the parties shall meet and confer and file a joint notice on or before August 4, 2026 setting out: (1) the citizenship of the members of Defendant DTLA LLC; (2) their respective positions on the existence of diversity jurisdiction in this action; and (3) whether I should exercise supplemental jurisdiction over the state law claims and counterclaim if diversity jurisdiction does not exist; and (4) whether the parties request referral to a United States Magistrate Judge for purposes of a settlement conference.

## IV.    **CONCLUSION**

For the foregoing reasons, I grant summary judgment on Counts Two and Three in favor of Defendants. I take under advisement the motion for summary judgment with respect to the state law claims and counterclaim pending my determination as to the Court's jurisdiction over those claims.

**SO ORDERED.**

New Haven, Connecticut
July 13, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge